In the Matter of the Estate of CHARLES KOLLMANN, Deceased.

Surrogate's Court, New York County, June 24, 1927.

### Wills — execution — evidence shows proper execution.

The testimony of one of the subscribing witnesses, the physician of the testator, and of the principal beneficiary under the will, shows conclusively that the will was properly executed, notwithstanding the contradictory testimony of two persons who signed as witnesses. The testimony of those persons cannot overcome the straightforward testimony of the physician and the beneficiary, and, therefore, it is held that the will was properly executed.

PROCEEDING for probate of will.

*Max Greenberger*, for the petitioner.

*Andrew F. McNamara*, special guardian.

O'BRIEN, S. This probate proceeding presents some unusual features. The propounded paper is holographic. The witnesses who signed the paper were testator's physician, Dr. Theodore Yuhl of 940 Park avenue, and a laundryman named Morris Glanz who conducted his laundry business at No. 132 East Seventeenth street in the same building where testator lived. A third signature was signed on the paper by the laundryman's son Herman, who had spent three years in high school. Dr. Yuhl testified to all the requirements of the statute regarding the execution of a will. Among the facts brought out in his testimony was the layout of testator's apartment, the doctor testifying as follows: " He had a two room apartment. The first entrance there was a so-called kitchen and dining room, and the front room, was his bedroom.

Misc. 42]         Surrogate's Court, New York County, June, 1927.

There was a table in the first room, the so-called dining room, and we stood there near the table and he showed me his will and he read it to me from the first letter to the last and asked me to sign it * * * he said this is the will as he wanted it and that Miss Anna Franklin should get everything, that he had other relatives and friends, but they were not good to him, and he wanted me to see that justice should be done * * *. It [*his signature*] was on the will, but he read it to me again and showed it to me and asked me to sign it again." The doctor then testified that he signed his name at the bottom of the paper. He further described the apartment, viz., " One room where there was a so-called alcove which can be closed. There was no door between the rooms. You can close it with draperies * * *. It was open and you could see the rooms at the same time, even the bed * * *." Upon being asked " and if anybody were in the bed in that bedroom you could see them? " he replied, " you must see them." The doctor further testified that testator's mind was clear, that he was of sound mind when he signed the paper, and that he did not see Mr. Glanz or his son there. It was the attitude and testimony of the latter that produced the unusual features of this proceeding. Before referring to their testimony, it is in order to mention here the experience which a clerk in the office of proponent's lawyer had when he called upon Glanz at his place of business to serve him with a subpœna. He testified as follows: " I gave him a subpœna and told him to be in court, I think it was on the following Tuesday, and he said that he was a very important witness, not only him, but it was supplemented by his wife, said he was a very important witness and that he could make the thing or break it. He did not say it in those words. *He said he wanted to be paid for it to make that will kosher.* I had a talk previous to that time that I served the subpœna in January and I knew what the conversation was going to be about, and I asked him, the last time you asked for $50, and he said that last time is gone and this time I want $150 before I go or else I tell anything that I want you to believe. He told me when he signed the will Mr. Kollmann was in bed, and he did not think Mr. Kollmann at the time knew what he was talking about, that is, Kollmann was in bed and if I tell the Judge Mr. Kollmann was in bed, that probably the Judge would not think he was in his right mind." This testimony was contradicted by Glanz when he was examined. Both the latter and his son Herman testified that they had been requested by Miss Franklin to come to the apartment and there they were asked by her to sign the paper. They were not in the apartment at the same time, having been called in separately. Each testified that he signed the paper but avoided any and all

admission that testator was in the room or rooms, that he had declared the signatures on the paper to be his or the paper to be his will or that he had signed the paper in the presence of either. In the testimony of Herman Glanz the following appears: " Q. Did you see Mr. Kollmann there? A. I did not notice him. He *may have been somewheres in the house.*" He admitted having discussed with his father the latter's testimony previously given, and that his father told him what he had sworn to in said testimony. (p. 30.) Other parts of his testimony were as follows: " Q. What did you think you were doing when you signed this paper? A. Signing a will. Q. Didn't you understand if the man was not there and you had just had the written paper and did not know whether it was his handwriting or his signature, his genuine signature that you might be perpetrating a fraud? A. I saw my father's signature there. Q. You think because you saw your father's signature there you felt safe did you? How old are you now? A. Twenty-one now. Q. Have you your license yet? A. No sir. What license do you mean? Q. To practice pharmacy. A. I have not got it yet." This witness further testified (p. 43): " Q. Was anything said to you at that time about signing a paper? A. All I was asked to sign. Q. Did you read it over? A. Well, I just glanced over it in a hurry. Q. Did you know it was a will? A. I noticed it was a will. Q. Did you ask for Mr. Kollmann at that time? A. I did not. Q. Did you ask why you were being brought into the apartment to sign and not sign it in your own apartment? A. I did not. Q. Didn't you want to know why you were brought into another apartment? A. I figured on doing a favor. Q. Did Miss Franklin have a paper in her hand at the time she came into your apartment? A. I do not remember. Q. When you came into that apartment could you see the bedroom? A. Well, I do not remember. I could see it if I was in there and looking for it. Q. You know how those rooms are situated, don't you? A. I live there and I guess I do. Q. You came into this combination kitchen and dining room, couldn't you see the bedroom? A. If I came in there I guess I could. I do not remember whether I saw it there or not. Q. When you came in did you go to the table? A. Straight to the table. Q. And you sat down there? A. I did not. Q. You stood there? A. Yes. Q. When you were asked to sign this paper, was anybody's else name signed to it? A. I remember seeing my father's name. Q. Did you see Dr. Yuhl's name signed to it? A. I do not remember whether I noticed it. Q. If I showed you the paper do you think that would refresh your recollection whether you signed it before the Doctor signed it? A. Well, I don't remember how the paper looked now. Q. You

knew that you were signing a will, did you not? A. Yes, sir. Q. And you read over the paper? A. I did not read it over thoroughly, but just glanced over it. Q. Did you say anything to Miss Franklin? A. Well, I did not have anything to say. I was asked as a favor to sign it, and I did sign. Q. When she asked you as a favor to sign it, did she tell you what the paper was? A. No, she did not. Q. She did not tell you what it was? A. No. Q. Were you going to school at that time? A. I was at high school at that time. Q. You mean to say you were given a paper and signed it, and you did not know what it was all about? A. I could read it. I could see that it was a will. Q. You read it over before you signed it? A. I glanced over to see what I was signing. Q. Did you see Mr. Kollmann's signature on there? A. I do not remember. Q. It may have been on there? A. Yes, it may have been on there. Q. What time in the morning was this? A. I cannot remember. Q. Was it before or after lunch? A. I do not remember. I was just getting up about ten o'clock and starting on my home work right away, but I do not remember what time it was. Q. Was it right after you got up that you were called in? A. I do not remember. I know that I was studying at the time. Q. After you signed you went out; is that right? A. Yes."

By the surrogate (p. 47): "Q. What did Miss Franklin say to you when you came into that place. A. Just please sign this, that is all. Q. Give me the exact words, every word she said? A. I cannot remember the exact words. Q. Do you think she said please sign? A. Something to that effect. Q. You understood it was a will? You understand a will to be the means by which the person making a will disposes of their property? A. Yes, sir. Q. You knew it was an important matter to some person? A. Yes, I g   , I did. Q. Did you ask her where Mr. Kollmann was? A. I did not. Q. Did you make any protest against signing a paper as a witness without the presence of Mr. Kollmann? A. I did not. Q. Did you say anything to her? A. I do not remember saying anything. I might have asked her what it was when she knocked on the door. That is about all. I did not know the lady very well. Q. You do not recall asking her anything about Mr. Kollmann? A. No. Q. You did not say to her where is he? A. No, sir. Q. How is he? A. No, sir. Q. When did he go out or when will he come back? A. No, sir. Q. You made no protest against signing a paper purporting to be a will without the presence of the man making it before you? A. No, sir. Q. How old are you? A. Twenty-one."

The following excerpts from the testimony indicate the general character of the elder Glanz's testimony, its inconsistencies and its ·evasiveness (pp. 63, 64, 65, 66): "Q. Did you look around

in any room when you came in? A. No. Q. Could you look into the bedroom? A. What did I have to look for? Q. Did you look into the bedroom when you came in the first, room, could you see the bedroom? A. I can see when I look, but I was not interested and I did not look there. Q. Did you think it important to see if Mr. Kollmann was around? A. I was not interested. Q. Didn't you want to know if Mr. Kollmann signed that will? A. I did not have any thought. I saw his signature. Q. Did you ask for Mr. Kollmann? A. No. I know before, I am a neighbor, and I know he was sick there. Q. You knew he was sick? A. Yes. Q. Did you look in the bedroom to see if he was lying in bed? A. No. * * * Q. You went upstairs because you knew you were going to sign the will of Mr. Kollmann? A. Yes. Q. And you expected to see him? A. Why not? Q. Is that right? A. Yes. Q. That is why you went upstairs? A. Yes. Q. When you got upstairs you went into this room? A. Yes. Q. How long did you stay there? A. Half a minute about. About ten seconds or fifteen seconds; no more. Q. Did you hear your son testify as to how long he said you stayed in that room? He said that he remembered you stayed in that room ten or fifteen minutes. A. For what? Q. I do not know. A. To sign a name, fifteen minutes? Why did I have to do that? I was there about ten seconds and walked out. * * * Q. Your son testified that you stayed in that room fifteen minutes, is that correct? A. Not correct. I was not in there fifteen minutes but ten seconds. Q. You signed your name and went out? A. Yes. Q. You did not wait to see Mr. Kollmann? A. I know that before he was awful sick. Q. You knew he was going to make a will? A. Not make a will, I know that from the sickness, not from the will. Q. You know that he was very sick? A. Yes. Q. And you knew that he was going to make a will? A. No. Q. You did not know it? A. No. Q. Who told you he was very sick? A. When your neighbor is sick who would have to tell me that? I saw the doctor and I saw that they brought him by a taxi from the street. Q. And you saw them bring him home? A. Yes. Q. That morning? A. No, before, eight days before. I don't remember that. He was sick on the street and they brought him home. Q. And you knew that he was a pretty sick man? A. Yes. Q. And you did not take the trouble to look in the bedroom to see if Mr. Kollmann was there? A. Why did I have to look? I know every .day he was sick. He was an old man and a sick man. I am not a doctor. Q. Did you want to know if he signed his name to that paper? A. I knew he was sick. Q. When you came in there didn't you ask to see Mr. Kollmann? A. For what? Q. For any reason at all?

Misc. 42]        Surrogate's Court, New York County, June, 1927.

A. Never was I in the rooms to speak with Mr. Kollmann, never. Q. When you came in this time did you ask about him? A. No. Q. You did not say anything? A. No. Q. Wasn't it as a matter of fact he was sitting right in that room where you signed the paper? A. Never, no. He was not sitting. He was sick. Q. You know he was sick? A. Yes. Q. Did you look in the bedroom to see if he was lying in bed? A. No."

In connection with this testimony it should be noted that Probate Clerk Jacob Washburn testified that in the examination of Glanz before him, the former testified that the paper was executed in his store and that it was not signed in the apartment. While the testimony of a sole beneficiary under a will is subject to the especial scrutiny given to the testimony of an interested witness, under the unusual situation presented in this proceeding it is certainly worthy of note. Said beneficiary Anna Franklin testified as follows (pp. 19, 20, 21): " Q. What did you say to him? A. Mr. Glanz, will you come up, Mr. Kollmann wants to see you. Q. What did he say? A. He spoke to Mr. Kollmann. Q. He came up, did he? A. Yes. Q. Into your apartment? A. Yes. Q. Where is your apartment located? A. One flight up. Q. One flight up at 132 East 17 Street? A. Yes. Q. Is it in the front or the rear of the house? A. The rear. Q. And he came up at that time? A. Yes. Q. What then happened? A. He spoke to Mr. Kollmann. Mr. Kollmann was sitting up and he explained to him and he signed his name and he sent his son up. Q. What did Mr. Kollmann say to him before Mr. Kollmann signed the paper? What did Mr. Kollmann say to Mr. Glanz when he came in? A. He told him he wanted to make out this will. He was sick for three years, and he said put your name here as a witness and Mr. Glanz said yes, and he signed his name. Q. Did Mr. Glanz say anything further to Mr. Kollmann? A. No, sir. Q. Did he ask him any questions? A. No. Q. And he withdrew and went downstairs after he signed his name? A. Yes, sir. Q. Did you see his son sign his name to it? A. He sent his son up. Q. The son signed his own name? A. Yes. Q. What did Mr. Kollmann say to the son before he signed his name? A. He came in and said, ' Mr. Kollmann, do you want to see me,' and he said ' yes, sign your name here,' and his son took the will and read it over and signed his name. Q. What did Mr. Kollmann say the paper was? A. A will. Q. Did he ask him to sign his will, to sign this paper? Did he call this paper his will and he asked the son to sign? A. Yes, he did. Q. How near was the bed in which Mr. Kollmann was sitting by the door of the kitchen? A. Right next to it, right close to the kitchen. Q. How near to the door? A.

About from here to the door. Q. Three or four feet away from the door of the kitchen. A. Yes. Q. Was the door of the kitchen open? A. Yes."

After carefully analyzing and weighing the testimony of Morris Glanz and his son I find it impossible to believe that they have given a truthful statement of what transpired at the time when they signed the propounded paper. Dr. Yuhl's testimony supplied all the statutory requirements and it is unimpeachable. Miss Franklin, notwithstanding her immediate interest in the probate of the paper, is a credible witness. The will, therefore, should be admitted to probate. (Surrogate's Court Act, § 142; *Matter of Barry*, 119 Misc. 102.) Submit decree accordingly.